This case is about Rule 56 and what the Rule 56 standard is in this circuit and what it should be in this circuit. There is no indication at all that the district court in this case considered a single word from plaintiff's witnesses, any of plaintiff's exhibits, any favorable testimony from defense witnesses, any of plaintiff's arguments, or even plaintiff's claims. Instead, the district court copied the defense brief verbatim and issued it as an order in the case. That cannot be the standard for summary judgment in this circuit. Now, what's the Eighth Circuit case that says that that's a basis that you can infer a violation of district court who obviously has been applying the rule for years from the way it crafted or appeared to craft its opinion? No, I agree with you. That's not a per se violation, Judge. But what the Eighth Circuit has said is that it raises some flags. And the Eighth Circuit has said that in two cases, sir. The Eighth Circuit said that in Petrovic v. Amico, which is 200 F3D 1140, 1150. They're not in your brief? Oh, they are, sir. And then, so I won't give that, but then the other case was Muschietti v. Chicago Century, and that's also in the brief. But it is de novo review. Nonetheless, in spite of that, it's de novo review. The only reason I bring it up is it does make a reviewing court's job that much harder because usually there's an order to review where someone has gone through the depositions, gone through the exhibits, narrowed the issues, and so we have things to focus on. And so at this point, I think the Eighth Circuit has two choices. On the one hand, it can engage in the de novo review and get into this evidence and figure out if this should proceed or not. Or alternatively, it can remand to the district court and ask it to do the Rule 56 analysis by actually examining plaintiff's evidence, examining plaintiff's arguments, crediting the facts and inferences in the case. Let me just review what the court wrote, whatever its source, and compare it to the summary judgment record. Yes, sir. So that's the other option. That's right. So then in that case... That's obviously what we do, especially with a judge of decades of experience. Well, sir, and I want to make clear, this isn't anything against the judge in this case. I know they were down to one judge, and they're probably pretty busy, and so this is nothing about that. I've never dealt with him before or anything. I just want to make sure my client gets a fair shake and make sure that somebody goes through... All right. Well, take what he wrote and attack it. Yes, sir. Regarding the evidence. So the first thing I would... I've always thought a district judge might take a proposed... Say you win an equitable decree argument before a trial judge, and the judge says, please submit a proposed form of order. I think that's a prudent way for a trial judge to proceed. So do I, except that's not what happened in this case. Well, whether it's the argument or the proposed form, it is akin to what you're arguing about. Okay. And maybe I'm just... I've never had the experience of having a brief copied like this issued as an order, and maybe that's my own inexperience. But to get to your point, judge, about what got wrong then or what wasn't considered, why should this be reversed? The first is that we had very strong evidence of pretext, and none of it was considered. Every single reason that Mid-Dakota offered for terminating Dr. J was discredited by its own and because they all said they were going to leave the clinic. So we deposed his primary nurse, his secondary nurse, his third nurse, his fourth nurse. They all said, no, that's not... They looked at me like I'm crazy. They said, no, we've never said that. He's just fine. His personality is just the same as anybody else. Well, my understanding was that not all of the nurses were going to leave, but doesn't the record show that at least three of them had threatened, contemplated leaving, largely due to Dr. J's conduct towards them? Thank you for that, judge. No, they didn't produce a single nurse that said that. Even the primary... So there is a document. I know what you're talking about. There is a memo that indicates that, that was crafted by Mid-Dakota's legal officer. But we deposed the actual nurses to ask them if they said the things that were attributed to them in this memo, and they said, no. Even Nurse Cook, who was sort of the main sort of antagonist, I think, or the person who didn't like Dr. J the most, she said, no, I never said that. I was willing to work with him. And so I think based on that, based on the fact that all the nurses that actually worked with them, including some of the others, based on the fact they couldn't find a single one to back up a word that was on this memo, a jury could conclude maybe that reason's not true. So then the second reason they said is, well, this may adversely affect patient care. Well, they themselves admitted a deposition. They did an investigation. There were no patient care issues. So then they said that Dr. J refused to participate in a reconciliation meeting that they set up with the nursing staff. Their medical director said that wasn't true, that Dr. J accepted the invitation, and that then this medical director decided on his own to not set it up. So then their fourth reason was that Dr. J refused to participate in a nurse navigator program and jeopardized their accreditation. We talked to the head of that nurse navigator program. She said, that's not true. Our accreditation was never jeopardized. And in fact, we only started this program a month before we terminated Dr. J. So then they said, well, there was significant concerns about his credentials, because he said he listed hematology on his credentials, and he wasn't a certified hematologist. So this is a false explanation case, not a shifting explanation case. Oh, Judge, it's both. Thank you for that, sir. I don't see any shifting. I see different ways to say the same thing, frankly. OK. I mean, go ahead and why is that wrong? Yes, sir. So I think the way I would- I understand a false argument. Yes, sir. So I'd like to- It is a pretext argument, which I think the U.S. Supreme Court and Reeves v. Sanderson said can be very powerful evidence. But as far as the shifting explanations, what we're doing is we're taking the letter where they committed to writing and said, well, these are the reasons we terminated him. We're comparing that to the answers in interrogatories where they said, well, no, these are the reasons we gave for terminating him. We're comparing that to the letter to the reasons they give to the EEOC where they said, no, these are the reasons we terminated him. And then we're comparing that to the answers they gave in depositions where they said, no, these are the reasons we're given for terminating him. And these reasons I've listed have all sort of evolved over time through that process I've said. And so that's why we say it's a shifting explanations theory, because it seems as though as each one is proven wrong, they come up with another one. And I hear your point, sir, that, well, aren't these all just kind of related, saying that he's a bad physician or we didn't want to work with him? But to me, they're different in that on the one hand, they're talking about patient care. On the one hand, they're talking about he didn't participate in this meeting. On the other hand, they're saying the nurses wanted to leave him. On the other hand, they're saying he falsely represented his credentials. And it is also a little stunning that not a single one of them is true, that even as they shifted, they still couldn't come up with anything that happened that even survived the testimony of their own witnesses. So then we get to the... My understanding, though, is one constant theme in all of the documents, and maybe I need to go back and redouble my efforts on the deposition testimony, is he just had a hard time getting along with others. I mean, that's why he was sent to the Vanderbilt program. That's why he did the thing in Lawrence, Kansas, the inpatient deal or the one where he spent a couple of weeks there. That's my understanding. And that seems to not be false, because it's the testimony as well. What's your response to that since you're emphasizing the falsity here? Yes, sir. And I think that's a fair... I don't think that that's unfair to say that he had interpersonal difficulties with people there. And so to that, I would say, then we move on to the similarly situated analysis. We compare him to other physicians at MidDakota who had similar interpersonal difficulties. And here, we're lucky in that there's an excellent comparator, someone who went to two training programs, just like someone who actually burned through nurses, who had six nurses quit because they couldn't stand it, in contrast to him who had none. Someone who was repeatedly counseled about her interpersonal relationships with nurses, with staff, with leadership, who continued to blame leaders, and who had her last incident the same month that Dr. J had his, February of 2014. And here's where the disparate treatment becomes kind of interesting, is that she comes back and she has recommendations from her physicians saying, okay, you need to have a reconciliation meeting with everyone, bring her back into the fold, have more communication. Very similar recommendations to what Dr. J had. They gave him four days before they fired him. They gave her two and a half years. They didn't implement a single recommendation that his physician said.  Yes, sir. So he goes to his second program, coaching program for these interpersonal issues in November. And he gets back from that November 2014. So once he gets back... Was this at Vanderbilt or this is at... This is Acumen, yes, sir. Pardon? Acumen. So one's named Vanderbilt, one is named Acumen. The comparator was coming back from Vanderbilt. That's right, sir. That's right. So... The time from plaintiff's return from Vanderbilt to the discipline? Oh, I would say about three months. But the reason I use Acumen is because what makes them similarly situated is they both went to these two coaching programs. They both go to one, they get recommended to go to a second, they go to the second, one gets two and a half years, one gets four days. But the whole time, it's the same governing board for the clinic, it's the same medical director. And so, I mean, in some ways, you really couldn't ask for a better sort of similarly situated analysis. So then you take, all right, we have pretext, we have shifting explanations, we have a similarly situated analysis. And then the fourth thing is pursuant to Hawkins and Estes, they determined there was another white physician, Caucasian physician there, who complained that the clinic's actions against Dr. J were racially discriminatory. They fired that physician, Dr. Roswick, and they told him, they said explicitly, the reason we're here is you raise this complaint of discrimination. I just tried that case two months ago, a jury awarded over a million dollars to him. And so now you have four things. You have, because I think pursuant to Hawkins and Estes, a jury can consider the overall work environment, and they can consider, well, gee, if the clinic terminated a white physician because he complained actions against Dr. J were discriminatory, couldn't they also conclude that they terminated Dr. J because he complained actions against him were racially discriminatory? And I've started eating in my rebuttal. I'd like to save it unless anybody has any questions. Okay, thank you all. Mr. Poresberg. Thank you, Judge. May it please the court counsel, my name is Scott Poresberg, and I represent the defendant, Mid-Dakota Clinic, on this appeal. The appellant concedes there's no direct evidence here, so we can proceed immediately, as the district court did, to the McDonnell-Douglas framework. And we submit for several reasons, this wasn't discussed in the main argument, and the district court melded the two and if there was a prima facie case, the clinic has still established a legitimate non-discriminatory reason for termination, and it wasn't terminated, and that he has not rebutted the pretext. So we submit that for several reasons the appellant cannot make a prima facie case here. The first is that he was not meeting his employer's legitimate expectations. I think if the court reviews the entire record in this case, as it must, a review of the record reveals considerable insubordination and defiance on the part of Dr. Baragwaj for his entire tenure at the clinic. It reveals refusal to take any responsibility for the state of the oncology department at the clinic, to the point that he lost the support of both of his oncology partners. Are you implying that there's a question of what the meeting of legitimate job expectations? That is the correct analysis, your honor. What about the argument that that's, I think that's an ADA standard, it's not the Title VII standard? No, there's, if you look at the Smith versus American Greetings Corp case, that's a 2012 8th Circuit decision, and that's a race decision, oh I'm sorry, it's Gibson, and that is 670 Fed 3844, 2012. In your brief? That is not in our brief. In light of the plaintiff's argument in his reply brief, I thought the need to obtain some more recent case law was necessary, but there are some cases in our brief that are older than that one, but that's a 2012 case, and that was a race discrimination case, and it very clearly said he met his employer's legitimate expectations, is the element that must be applied. What about the nurses? You talked about the two oncology partners, but you have the nurses, and he says, yeah, you got the document that points out three of the 11 threatening to leave, but when he deposed him, he said they denied that. If you look at that, if you look at that memo, your honor, and that's at app 462 to 465, that's the Pam Crawford memo. She was the compliance officer for the clinic at the time of Dr. Braguage's suspension, and she met with the nurses along with the chief nurse, and she committed all of the information she got from the nurses in the memo. That's a critically important document. If you look at the very end of that memo, she says, I think if we don't do something here, all of the nurses are going to leave, and that's her supposition, and that became the mantra of Dr. Braguage that all of the nurses would have left. All of the nurses said they would leave. I will leave unless he is gone tomorrow. That's not what the evidence shows. The evidence shows that there were significant, significant problems to the point of rebellion in the oncology department, and that that was what the compliance officer assumed would happen if they didn't do something about it. But opposing counsel says, you know, he went beyond that, and he said when these nurses were deposed, they talked about how they got along just fine with them, and that they weren't going to leave. Now, can you point me to evidence in the record? That would create a genuine issue of material fact if that were true, but so I'm looking for something that rebutts that. Well, I think you have to look at the record, Your Honor. I think that the Pam Crawford memo, the nurses didn't say that. Sometimes with the passage of time and the removal of the- Wait, they didn't say that in the deposition, or they- They didn't say that in the deposition. They didn't say- Okay, now why you went back to the memo, Judge Strauss was asking you about the testimony. I'm getting to that. In the deposition, can I cite you in any deposition testimony as I stand here today? I'd have to look at the appendix on that and get back to you. I'd certainly be willing to do that. I do not believe that would create a genuine issue of material fact. What was reported to the decision makers here was Pam Crawford's memo. So your point is you don't have specific sites, but you think that that's a mischaracterization or- I do.  I do. Your Honor, the way that the clinics work, the doctor's own assigned nurse, they tend to generate almost a familial relationship. There is incredible loyalty that runs back and forth. Dr. Baragwaj's nurse, Linda Neff, was deposed. And she was asked, after he went to Vanderbilt and was then sent to Acumen and he returned to the clinic, that's what Mr. Medea said was a two and a half day gap before he was terminated, what was his attitude? And Linda Neff said he was more paranoid even than usual. He would tell us, you better watch your back. You better not talk to that person because if you do, they're going to get you fired. That's the way he was after all of this counseling, this two-week counseling, three-week counseling session that he received at Acumen. He came back to the clinic with that attitude. There was no one that went through any kind of Vanderbilt or Acumen program that came back with that kind of attitude. If you look at the Vanderbilt report that's in the appendix that was generated for Dr. Baragwaj, you'll see incredible defiance even with his treaters at the Vanderbilt program. He refused to give authorization to allow certain people at the clinic to speak to Vanderbilt. He insisted on sitting in at Vanderbilt on some of the sessions where they were interviewing people at the clinic. Incredibly defiant attitude and an unwillingness to change sets him completely apart from any of the other people that went through this at the clinic. So was he meeting the employer's legitimate job expectations? We submit that in the Eighth Circuit, that is an element of the premium facie case and he was not doing that here. And there are also a number of cases cited in the Smith case I brought up today because I thought something more recent would be helpful. I'm not sure I understand exactly your response to Judge Stross about what comes out in the depositions of the nurses. Are you saying that what counsel has said is simply a total mischaracterization of the deposition testimony or that the nurses in their depositions backed off from their original feelings about the doctor? What exactly are you saying about that testimony? What I'm saying is that there is no evidence that at that Pam Crawford meeting they all said we are going to leave unless he leaves. That was never said. That was Pam Crawford's supposition based on the facts that they told her they were going through. Then you go to the depositions, they all said that he had difficulty in the clinic, but when asked, oh isn't it true that you could have worked through that, you weren't going to leave, were you? Some of them answered no. And so I think the court just has to look at those depositions and I don't think that that creates a fact issue because I think that even if the nurses all said we would have stayed, where is the evidence that that's what the decision makers relied on? You look at the Pam Crawford memo and she's got more than a dozen bullet points of specific complaints that the nurses had about working with him. So whether or not they were going to leave, what difference does that make in whether or not the decision makers based their decision on that? There's no evidence that that's... But it would make a decision, I don't want to belabor the point, but it would make a decision if they said, oh, you know what? He wasn't so bad. Yes, he's difficult, but that's just him being him and we could get along with him fine as long as you knew how to deal with him. That would create a genuine issue of material fact as to whether these interpersonal relationships really were the cause of dismissing him. Well, I'm not sure it would because I think if you look at the Pam Crawford memo, that's what was delivered to the decision makers. That's what they based their decision on. And this is before race even entered the equation. So if Pam Crawford sent her memo to the decision makers and it was all a bunch of lies, I don't know what evidence there would be of that. What was her motivation for that? Where's the evidence that it was race or it was retaliation or it was something else? I mean, at all times under the McDonnell Douglas standard, the burden remains with the plaintiff to prove intentional discrimination or intentional retaliation. That's where this case falls. That's what the district court found. Second item of the prima facie case, adverse employment action. It's undisputed here that Dr. Baragwaj resigned before a vote of the shareholders was taken. We don't know how that vote would have come out if it had actually gone forward. 67% of the shareholders had to move to terminate in order for it to be effective. That's a pretty significant majority and the record shows that Dr. Baragwaj had- I thought that one of the clinics, yeah, the CEO, somebody said, if you don't resign, you're going to lose your license. And that doesn't make any sense. It doesn't make any sense, but it's in the record. Even if that were the case, your honor, we've cited case law in our brief and the district court noted that the reason if you resign because you fear the consequences of being terminated, that is not a constructive discharge. And what's the loop, but to lose your license, that's not just, that's more significant than losing this particular job. Under the law of this circuit and cited in our brief, that is not a constructive discharge. And that's not- No, no, no, no. You're arguing prima facie case. I am. Both of you guys jump all over the place. But the issue is with the prima facie case- You're saying that there was no adverse employment action because he quit. That's correct. Well, when a supervisor says, if you don't resign, you're going to lose your license, and he resigns, and it's coerced. I don't care whether it's constructive discharge or not. There's no case law that's been cited to this court that would support that position, and that's not the way it- Okay. Every case is different, you know? That's not the way it happened. I mean, anybody that resigns can later say, my boss told me if I didn't- That's not the way it happens is for a jury to decide. Well, there's no case law on this circuit that would hold that. First, they have to meet the prima facie case before we even get to the legitimate- The prima facie case is not supposed to be that hard to meet. Well, it depends. I don't think it depends. Well, it depends, but I think the Supreme Court's ancient saying of that is still sound. Well, meeting the legitimate expectations of the employer means you're getting into substance. What Supreme Court case talks about says that's an element? Oh, I don't know that they do, but the Eighth Circuit does. Well, they've defined the prima facie case many times. The Eighth Circuit uses that language, and that is getting into the substance of the claim. All right. If we use the language and it's contrary to the Supreme Court, what do we do? Well, you- I mean, the Supreme Court has said from day one, the prima facie case, yes, it's significant, but it's not that hard to meet. And so the typical case, okay, let's get to the, why did you do it, employer? And then let's get the pretext. And that's what- That's what we do in probably 95% of the recent Title VII cases. I would agree with that. And that's what the- And you're not even going there. And that's what the district court did here. I'm just trying to go through all the bases. I've only got two and a half minutes left, and I realize the court wants to talk about- But you've gone through every element of the prima facie case. As far as I can see, they're all contestable. Yeah. And they're not, I mean, I didn't go through all of them. There are some- Well, you didn't get to the third one. The similarly situated, I could talk about that, but if the court wants to move on to legitimate non-discriminatory reason, I think- I'd like to go to pretext, actually, with your remaining time. Sure. You've got two minutes to do pretext. Absolutely. Which is the main issue before us. Yep. And it's important to note that an employee has to both discredit the employer's articulated reasons for the discipline and demonstrate the circumstances permit a reasonable inference of discriminatory animus. So it has to do both. And that's the Banks v. Deere case. That's in our brief, 8th Circuit, 2016. The appellant has not raised any reasonable inference here. The court can look at the various complaints that Dr. Baragwaj submitted to the EEOC and the North Dakota Department of Labor as its starting point. In the first one, he alleged he was only retaliated against for reporting another doctor's delinquent encounters. And that's a quote. These were the late charts that was the reason for his original DOT or NDDOL charge. And we established conclusively, it's undisputed, that that is not fraud. He was confused about that. That is not any kind of Medicare fraud. There was no articulation in that DOL charge about any racial motivation at all. He was only after being asked follow-up questions by the EEOC and the Department of Labor, where he quoted an email from a nurse that's in the briefs and heavily briefed. And he quoted it directly, even with the all caps intact, where she allegedly called him Ahmed the Dead Terrorist. And that email is actually in the record. The court can look at that and see the So in his final complaint to the EEOC and the Department of Labor, he makes no mention of any kind of retaliation or fraudulent claims act. And the appellant responds that the NDDOL does not have jurisdiction to investigate retaliation claims. That's not true. The DOL in North Dakota is a fair employment practice agency that contracts with the EEOC to investigate EEOC claims in North Dakota. So there's absolutely no documentation from Dr. Baragwaj's tenure at the clinic whatsoever. Not a document where he documented complaining of any kind of racial discrimination. Not a scrap. Compare that to the volumes and volumes of documents where he's complaining about care issues, nursing issues, other things, everything under the sun, including the fact that another doctor was behind on his charts and he believed that was fraud. That is documented. Nothing else. I see my time is up. Thank you. Thank you. Thank you sir. Gentlemen, I wanted to circle back to this issue of what the nurses said in their depositions because that seems to be something that people have some questions about. To be clear, we cited, we gave you the exact pinpoint sites in our briefs of what the nurses said. They said his personality is pretty much average. I didn't lead them or anything. I said, did you have any problems with him? No, I didn't have any problems with him. It is true that his personal, that his first nurse, the one who said, one of the ones who said she had no problems with him did say, yeah, he's a little paranoid. That's kind of the way he is. She didn't make comments like that, but nobody said that they personally had problems with him. Nobody said that they threatened to leave because of him. And then they said, well, it doesn't matter because that's what was said in the memo. And maybe the decision makers relied on the memo. They didn't know what the nurse said. That doesn't do any work for him either because the medical director, Dr. Tan. Is your argument that the, that the clinics decision makers were required to look behind the Crawford memo? No, sir. What I was saying is the decision makers were present at the meeting, the medical director himself. What meeting? So her interview of the nurses? Yes, sir. So they, they did this, uh, Crawford, who's their legal officer meets with these nurses. And what is the legal law? I thought one of you says compliance officer. And one of you says legal officer. I'm sorry, sir. Same difference. Same thing. Legal compliance officer called that same woman, Pam Crawford. She meets with these, she's supposed to keep them out of trouble. Supposed to judge. Yes, sir. Well, all right. That's significant. You're accusing her of not doing her job. I'm just saying the nurse, she didn't, she, all of her nurse interviews that she summarized in her memo, the decision makers were present. The, there was just one main meeting, sir. So there weren't individual meetings with the nurses. There was one kind of town hall meeting. And what I'm saying is the medical director was there present at it. And later he testified that after he got this memo, he personally investigated when they suspended Dr. J, he said he continued this investigation to make sure it was true. So I, that's why I'm saying, I don't think they can throw this on her because this is the guy making the decision to recommend his termination. What about the oncology partners? I want to give you time because we talked about the fact that he's difficult to get along with. And that seemed to me to be sort of unrebutted that his oncology partners did not get along with him. Sir, I think that's, I mean, I think that's right. I don't, you know, except the only thing I would say is that talking about shifting reasons, like Judge Shepard said, that came out at the termination meeting itself. So this reason of terminating him because his oncology partners don't agree with him or don't get along with him, that wasn't mentioned as a reason for suspension. It wasn't mentioned as a reason for his termination. It wasn't mentioned all the way until his termination meeting as they were going through these different reasons, like he has a psychiatric illness or he has paranoia. When they're coming up with these other things, that's when they stood up. So, and there's only, you know, and one of them's a fellow shareholder and one of them was a physician, wasn't shareholder yet. But I think that's true, Judge. I don't want to argue with that. May I make one last point, sir? Yes. Okay. Thank you. Just this thing about Dr. J came back from his treatment and he was angry and vindictive and defiant. That's not accurate either. When he came back from Acumen, they said he'd made breakthroughs there, that they were proud of his progress. Yeah, I know that's in the briefs. Okay. Thank you, sir. Thank you, everybody. Thank you, counsel. Case has been thoroughly briefed and argued and we will take it under advisement.